Justice KAGAN delivered the opinion of the Court.
*2297 Two Terms ago, in Matal v. Tam , 582 U. S. ----, 137 S.Ct. 1744, 198 L.Ed.2d 366 (2017), this Court invalidated the Lanham Act's bar on the registration of "disparag[ing]" trademarks. 15 U.S.C. § 1052(a). Although split between two non-majority opinions, all Members of the Court agreed that the provision violated the First Amendment because it discriminated on the basis of viewpoint. Today we consider a First Amendment challenge to a neighboring provision of the Act, prohibiting the registration of "immoral[ ] or scandalous" trademarks. Ibid. We hold that this provision infringes the First Amendment for the same reason: It too disfavors certain ideas.
I
Respondent Erik Brunetti is an artist and entrepreneur who founded a clothing line that uses the trademark FUCT. According to Brunetti, the mark (which functions as the clothing's brand name) is pronounced as four letters, one after the other: F-U-C-T. See Brief for Respondent 1. But you might read it differently and, if so, you would hardly be alone. See Tr. of Oral Arg. 5 (describing the brand name as "the equivalent of [the] past participle form of a well-known word of profanity"). That common perception caused difficulties for Brunetti when he tried to register his mark with the U. S. Patent and Trademark Office (PTO).
Under the Lanham Act, the PTO administers a federal registration system for trademarks. See 15 U.S.C. §§ 1051, 1052. Registration of a mark is not mandatory. The owner of an unregistered mark may still use it in commerce and enforce it against infringers. See Tam , 582 U. S., at ----, 137 S.Ct., at 1752. But registration gives trademark owners valuable benefits. For example, registration constitutes "prima facie evidence" of the mark's validity. § 1115(a). And registration serves as "constructive notice of the registrant's claim of *2298 ownership," which forecloses some defenses in infringement actions. § 1072. Generally, a trademark is eligible for registration, and receipt of such benefits, if it is "used in commerce." § 1051(a)(1). But the Act directs the PTO to "refuse[ ] registration" of certain marks. § 1052. For instance, the PTO cannot register a mark that "so resembles" another mark as to create a likelihood of confusion. § 1052(d). It cannot register a mark that is "merely descriptive" of the goods on which it is used. § 1052(e). It cannot register a mark containing the flag or insignia of any nation or State. See § 1052(b). There are five or ten more (depending on how you count). And until we invalidated the criterion two years ago, the PTO could not register a mark that "disparage[d]" a "person[ ], living or dead." § 1052(a) ; see Tam , 582 U. S. ----, 137 S.Ct. 1744, 198 L.Ed.2d 366.
This case involves another of the Lanham Act's prohibitions on registration-one applying to marks that "[c]onsist[ ] of or comprise[ ] immoral[ ] or scandalous matter." § 1052(a). The PTO applies that bar as a "unitary provision," rather than treating the two adjectives in it separately. In re Brunetti , 877 F.3d 1330, 1336 (C.A. Fed. 2017) ; Brief for Petitioner 6 (stating that the PTO "has long treated the two terms as composing a single category"). To determine whether a mark fits in the category, the PTO asks whether a "substantial composite of the general public" would find the mark "shocking to the sense of truth, decency, or propriety"; "giving offense to the conscience or moral feelings"; "calling out for condemnation"; "disgraceful"; "offensive"; "disreputable"; or "vulgar." 877 F.3d at 1336 (internal quotation marks omitted); see Brief for Petitioner 6 (agreeing that the PTO "generally defines" the category in that way).
Both a PTO examining attorney and the PTO's Trademark Trial and Appeal Board decided that Brunetti's mark flunked that test. The attorney determined that FUCT was "a total vulgar" and "therefore[ ] unregistrable." App. 27-28. On review, the Board stated that the mark was "highly offensive" and "vulgar," and that it had "decidedly negative sexual connotations." App. to Pet. for Cert. 59a, 64a-65a. As part of its review, the Board also considered evidence of how Brunetti used the mark. It found that Brunetti's website and products contained imagery, near the mark, of "extreme nihilism" and "anti-social" behavior. Id., at 64a. In that context, the Board thought, the mark communicated "misogyny, depravity, [and] violence." Ibid . The Board concluded: "Whether one considers [the mark] as a sexual term, or finds that [Brunetti] has used [the mark] in the context of extreme misogyny, nihilism or violence, we have no question but that [the term is] extremely offensive." Id., at 65a.
Brunetti then brought a facial challenge to the "immoral or scandalous" bar in the Court of Appeals for the Federal Circuit. That court found the prohibition to violate the First Amendment. As usual when a lower court has invalidated a federal statute, we granted certiorari. 586 U. S. ----, 139 S.Ct. 782, 202 L.Ed.2d 510 (2019).
II
This Court first considered a First Amendment challenge to a trademark registration restriction in Tam , just two Terms ago. There, the Court declared unconstitutional the Lanham Act's ban on registering marks that "disparage" any "person[ ], living or dead." § 1052(a). The eight-Justice Court divided evenly between two opinions and could not agree on the overall framework for deciding the case. (In particular, no majority emerged to resolve *2299 whether a Lanham Act bar is a condition on a government benefit or a simple restriction on speech.) But all the Justices agreed on two propositions. First, if a trademark registration bar is viewpoint-based, it is unconstitutional. See 582 U. S., at ---- - ----, ---- - ----, 137 S.Ct., at 1751, 1762-1763 (opinion of ALITO, J.); id., at ---- - ----, ----, 137 S.Ct., at 1751, 1753 (opinion of Kennedy, J.). And second, the disparagement bar was viewpoint-based. See id., at ---- - ----, ---- - ----, 137 S.Ct., at 1751, 1762-1763 (opinion of ALITO, J.); id., at ---- - ----, 137 S.Ct., at 1751-1753 (opinion of Kennedy, J.)
The Justices thus found common ground in a core postulate of free speech law: The government may not discriminate against speech based on the ideas or opinions it conveys. See Rosenberger v. Rector and Visitors of Univ. of Va. , 515 U.S. 819, 829-830, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (explaining that viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional"). In Justice Kennedy's explanation, the disparagement bar allowed a trademark owner to register a mark if it was "positive" about a person, but not if it was "derogatory." Tam , 582 U. S., at ----, 137 S.Ct., at 1750. That was the "essence of viewpoint discrimination," he continued, because "[t]he law thus reflects the Government's disapproval of a subset of messages it finds offensive." Id., at ---- - ----, 137 S.Ct., at 1766. Justice ALITO emphasized that the statute "denie[d] registration to any mark" whose disparaging message was "offensive to a substantial percentage of the members of any group." Id., at ----, 137 S.Ct., at 1763. The bar thus violated the "bedrock First Amendment principle" that the government cannot discriminate against "ideas that offend." Id., at ---- - ----, 137 S.Ct., at 1751. Slightly different explanations, then, but a shared conclusion: Viewpoint discrimination doomed the disparagement bar.
If the "immoral or scandalous" bar similarly discriminates on the basis of viewpoint, it must also collide with our First Amendment doctrine. The Government does not argue otherwise. In briefs and oral argument, the Government offers a theory for upholding the bar if it is viewpoint-neutral (essentially, that the bar would then be a reasonable condition on a government benefit). See Brief for Petitioner 14-26. But the Government agrees that under Tam it may not "deny registration based on the views expressed" by a mark. Tr. of Oral Arg. 24. "As the Court's Tam decision establishes," the Government says, "the criteria for federal trademark registration" must be "viewpoint-neutral to survive Free Speech Clause review." Pet. for Cert. 19. So the key question becomes: Is the "immoral or scandalous" criterion in the Lanham Act viewpoint-neutral or viewpoint-based?
It is viewpoint-based. The meanings of "immoral" and "scandalous" are not mysterious, but resort to some dictionaries still helps to lay bare the problem. When is expressive material "immoral"? According to a standard definition, when it is "inconsistent with rectitude, purity, or good morals"; "wicked"; or "vicious." Webster's New International Dictionary 1246 (2d ed. 1949). Or again, when it is "opposed to or violating morality"; or "morally evil." Shorter Oxford English Dictionary 961 (3d ed. 1947). So the Lanham Act permits registration of marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts. And when is such material "scandalous"? Says a typical definition, when it "giv[es] offense to the conscience or moral feelings"; "excite[s] reprobation";
*2300 or "call[s] out condemnation." Webster's New International Dictionary, at 2229. Or again, when it is "shocking to the sense of truth, decency, or propriety"; "disgraceful"; "offensive"; or "disreputable." Funk & Wagnalls New Standard Dictionary 2186 (1944). So the Lanham Act allows registration of marks when their messages accord with, but not when their messages defy, society's sense of decency or propriety. Put the pair of overlapping terms together and the statute, on its face, distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation. The statute favors the former, and disfavors the latter. "Love rules"? "Always be good"? Registration follows. "Hate rules"? "Always be cruel"? Not according to the Lanham Act's "immoral or scandalous" bar.
The facial viewpoint bias in the law results in viewpoint-discriminatory application. Recall that the PTO itself describes the "immoral or scandalous" criterion using much the same language as in the dictionary definitions recited above. See supra, at 2298. The PTO, for example, asks whether the public would view the mark as "shocking to the sense of truth, decency, or propriety"; "calling out for condemnation"; "offensive"; or "disreputable." Brief for Petitioner 6 (internal quotation marks omitted). Using those guideposts, the PTO has refused to register marks communicating "immoral" or "scandalous" views about (among other things) drug use, religion, and terrorism. But all the while, it has approved registration of marks expressing more accepted views on the same topics. See generally Gilson & LaLonde, Trademarks Laid Bare, 101 Trademark Reporter 1476, 1510-1513, 1518-1522 (2011) ; Brief for Barton Beebe et al. as Amici Curiae 28-29.
Here are some samples. The PTO rejected marks conveying approval of drug use (YOU CAN'T SPELL HEALTHCARE WITHOUT THC for pain-relief medication, MARIJUANA COLA and KO KANE for beverages) because it is scandalous to "inappropriately glamoriz[e] drug abuse." PTO, Office Action of Aug. 28, 2010, Serial No. 85038867; see Office Action of Dec. 24, 2009, Serial No. 77833964; Office Action of Nov. 17, 2009, Serial No. 77671304. But at the same time, the PTO registered marks with such sayings as D.A.R.E. TO RESIST DRUGS AND VIOLENCE and SAY NO TO DRUGS-REALITY IS THE BEST TRIP IN LIFE. See PTO, Reg. No. 2975163 (July 26, 2005); Reg. No. 2966019 (July 12, 2005). Similarly, the PTO disapproved registration for the mark BONG HITS 4 JESUS because it "suggests that people should engage in an illegal activity [in connection with] worship" and because "Christians would be morally outraged by a statement that connects Jesus Christ with illegal drug use." Office Action of Mar. 15, 2008, Serial No. 77305946. And the PTO refused to register trademarks associating religious references with products (AGNUS DEI for safes and MADONNA for wine) because they would be "offensive to most individuals of the Christian faith" and "shocking to the sense of propriety." Ex parte Summit Brass & Bronze Works , 59 U.S.P.Q. 22, 23 (Dec. Com. Pat. 1943) ; In re Riverbank Canning Co. , 95 F.2d 327, 329 (CCPA 1938). But once again, the PTO approved marks-PRAISE THE LORD for a game and JESUS DIED FOR YOU on clothing-whose message suggested religious faith rather than blasphemy or irreverence. See Reg. No. 5265121 (Aug. 15, 2017); Reg. No. 3187985 (Dec. 19, 2006). Finally, the PTO rejected marks reflecting support for al-Qaeda (BABY AL QAEDA and AL-QAEDA on t-shirts) "because the bombing of civilians *2301 and other terrorist acts are shocking to the sense of decency and call out for condemnation." Office Action of Nov. 22, 2004, Serial No. 78444968; see Office Action of Feb. 23, 2005, Serial No. 78400213. Yet it approved registration of a mark with the words WAR ON TERROR MEMORIAL. Reg. No. 5495362 (Jun. 19, 2018). Of course, all these decisions are understandable. The rejected marks express opinions that are, at the least, offensive to many Americans. But as the Court made clear in Tam , a law disfavoring "ideas that offend" discriminates based on viewpoint, in violation of the First Amendment. 582 U. S., at ----, 137 S.Ct., at 1751 (opinion of ALITO, J.); see id., at ---- - ----, 137 S.Ct., at 1762-1763 ; id., at ---- - ----, 137 S.Ct., at 1765-1766 (opinion of Kennedy, J.)
How, then, can the Government claim that the "immoral or scandalous" bar is viewpoint-neutral? The Government basically asks us to treat decisions like those described above as PTO examiners' mistakes. See Brief for Petitioner 46. Still more, the Government tells us to ignore how the Lanham Act's language, on its face, disfavors some ideas. In urging that course, the Government does not dispute that the statutory language-and words used to define it-have just that effect. At oral argument, the Government conceded: "[I]f you just looked at the words like 'shocking' and 'offensive' on their face and gave them their ordinary meanings[,] they could easily encompass material that was shocking [or offensive] because it expressed an outrageous point of view or a point of view that most members" of society reject. Tr. of Oral Arg. 6. But no matter, says the Government, because the statute is "susceptible of" a limiting construction that would remove this viewpoint bias. Id., at 7 (arguing that the Court should "attempt to construe [the] statute in a way that would render it constitutional"). The Government's idea, abstractly phrased, is to narrow the statutory bar to "marks that are offensive [or] shocking to a substantial segment of the public because of their mode of expression, independent of any views that they may express." Id., at 11 (emphasis added); see Brief for Petitioner 27-28. More concretely, the Government explains that this reinterpretation would mostly restrict the PTO to refusing marks that are "vulgar"-meaning "lewd," "sexually explicit or profane." Id., at 27, 30. Such a reconfigured bar, the Government says, would not turn on viewpoint, and so we could uphold it.
But we cannot accept the Government's proposal, because the statute says something markedly different. This Court, of course, may interpret "ambiguous statutory language" to "avoid serious constitutional doubts." FCC v. Fox Television Stations, Inc. , 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). But that canon of construction applies only when ambiguity exists. "We will not rewrite a law to conform it to constitutional requirements." United States v. Stevens , 559 U.S. 460, 481, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (internal quotation marks and alteration omitted). So even assuming the Government's reading would eliminate First Amendment problems, we may adopt it only if we can see it in the statutory language. And we cannot. The "immoral or scandalous" bar stretches far beyond the Government's proposed construction. The statute as written does not draw the line at lewd, sexually explicit, or profane marks. Nor does it refer only to marks whose "mode of expression," independent of viewpoint, is particularly offensive. Brief for Petitioner 28 (internal quotation marks omitted). It covers the universe of immoral or scandalous-or (to use some PTO synonyms) offensive or disreputable-material. Whether or not lewd or profane. Whether the scandal and *2302 immorality comes from mode or instead from viewpoint. To cut the statute off where the Government urges is not to interpret the statute Congress enacted, but to fashion a new one.*
And once the "immoral or scandalous" bar is interpreted fairly, it must be invalidated. The Government just barely argues otherwise. In the last paragraph of its brief, the Government gestures toward the idea that the provision is salvageable by virtue of its constitutionally permissible applications (in the Government's view, its applications to lewd, sexually explicit, or profane marks). See id. , at 47. In other words, the Government invokes our First Amendment overbreadth doctrine, and asks us to uphold the statute against facial attack because its unconstitutional applications are not "substantial" relative to "the statute's plainly legitimate sweep." Stevens , 559 U.S. at 473, 130 S.Ct. 1577 (internal quotation marks omitted). But to begin with, this Court has never applied that kind of analysis to a viewpoint-discriminatory law. In Tam , for example, we did not pause to consider whether the disparagement clause might admit some permissible applications (say, to certain libelous speech) before striking it down. The Court's finding of viewpoint bias ended the matter. And similarly, it seems unlikely we would compare permissible and impermissible applications if Congress outright banned "offensive" (or to use some other examples, "divisive" or "subversive") speech. Once we have found that a law "aim[s] at the suppression of " views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute? Tam , 582 U. S., at ----, 137 S.Ct., at 1761 (opinion of Kennedy, J.). But in any event, the "immoral or scandalous" bar is substantially overbroad. There are a great many immoral and scandalous ideas in the world (even more than there are swearwords), and the Lanham Act covers them all. It therefore violates the First Amendment.
We accordingly affirm the judgment of the Court of Appeals.
It is so ordered.

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co. , 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.