# United States Court of Appeals for the Federal Circuit

---

**IN RE:  STEVE ELSTER,**
*Appellant*

---

2020-2205

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 87749230.

---

Decided:  February 24, 2022

---

JONATHAN TAYLOR, Gupta Wessler PLLC, Washington, DC, argued for appellant.  Also represented by GREGORY A. BECK.

JOSHUA MARC SALZMAN, Civil Division, Appellate Staff, United States Department of Justice, Washington, DC, argued for appellee Andrew Hirshfeld.  Also represented by BRIAN M. BOYNTON, DANIEL TENNY; THOMAS L. CASAGRANDE, CHRISTINA J. HIEBER, THOMAS W. KRAUSE, FARHEENA YASMEEN RASHEED, MOLLY R. SILFEN, Office of the Solicitor, United States Patent and Trademark Office, Alexandria, VA.

MATTHEW ALBERT HANDAL, New York, NY, as amicus curiae, pro se.

---

Before DYK, TARANTO, and CHEN, *Circuit Judges*.

DYK, *Circuit Judge*.

Steve Elster appeals a decision of the Trademark Trial and Appeal Board ("Board"). The Board affirmed an examiner's refusal to register the trademark "TRUMP TOO SMALL" for use on T-shirts. The Board's decision was based on section 2(c) of the Lanham Act, 15 U.S.C. § 1052(c), and the Board's finding that the mark included the surname of a living individual, President Donald J. Trump, without his consent. Because we hold that applying section 2(c) to bar registration of Elster's mark unconstitutionally restricts free speech in violation of the First Amendment, we reverse the Board's decision.

## BACKGROUND

In 2018, Elster sought to register the phrase "TRUMP TOO SMALL" in standard characters for use on shirts in International Class 25. The class of goods encompasses:

> Shirts; Shirts and short-sleeved shirts; Graphic T-shirts; Long-sleeved shirts; Short-sleeve shirts; Short-sleeved shirts; Short-sleeved or long-sleeved t-shirts; Sweat shirts; T-shirts; Tee shirts; Tee-shirts; Wearable garments and clothing, namely, shirts. . . .

J.A. 1–2. According to Elster's registration request, the phrase he sought to trademark invokes a memorable exchange between President Trump and Senator Marco Rubio from a 2016 presidential primary debate, and aims to "convey[] that some features of President Trump and his policies are diminutive." J.A. 5.

The Patent and Trademark Office ("PTO") examiner rejected Elster's proposed mark on two grounds. First, the examiner concluded that the mark was not registrable because section 2(c) of the Lanham Act bars registration of a

trademark that "[c]onsists of or comprises a name . . . identifying a particular living individual" without the individual's "written consent." § 1052(c). Consistent with this provision, Elster's mark could not be registered because it used Trump's name without his consent. It did not matter, according to the examiner, that the mark was "intended as political commentary" because there is no statutory or "case law carve[] out" for "political commentary." J.A. 201. The examiner rejected Elster's contention that denying the application infringed his First Amendment rights, finding that the registration bars are not restrictions on speech, and in the alternative, that any such restriction would be permissible. In a separate decision, the examiner also denied registration of the mark under section 2(a)'s false association clause, which bars registration of trademarks that "falsely suggest a connection with persons, living or dead." § 1052(a). The examiner here also rejected a First Amendment defense.

Elster appealed both decisions to the Board, which consolidated the two cases. Elster argued that sections 2(c) and 2(a) constituted impermissible content-based restrictions on speech. He contended that strict scrutiny should apply, that neither provision was narrowly tailored to serve a compelling government interest, and that any government interest was outweighed by the First Amendment interest in allowing commentary and criticism regarding a political figure. The Board affirmed the examiner's denial of the mark in a decision that rested solely on section 2(c) grounds, finding it unnecessary to address the rejection under section 2(a).

Although the Board recognized that it does not have authority to declare statutory provisions unconstitutional, it noted that prior Board decisions have addressed the constitutionality of section 2(c) in light of the Board's experience and familiarity with the purposes underlying the statute, and it concluded that section 2(c) was not an

unconstitutional restriction on free speech. The Board explained, "even if Section 2(c) were subject to greater scrutiny," it is narrowly tailored to advance two compelling government interests: protecting the named individual's rights of privacy and publicity and protecting consumers against source deception. J.A. 10. Elster appeals. We have jurisdiction pursuant to 15 U.S.C. § 1071(a).

## DISCUSSION

## I

Section 2 of the Lanham Act requires the PTO to refuse registration of certain categories of proposed trademarks. In the last five years, the Supreme Court has held unconstitutional two provisions of section 2. In *Matal v. Tam*, 582 U.S. ___, 137 S. Ct. 1744 (2017), the Court considered a provision of section 2(a) of the Lanham Act, which directed the PTO to deny registration of marks that "disparage . . . or bring . . . into contempt[] or disrepute" any "persons, living or dead," 15 U.S.C. § 1052(a). The eight-Justice Court was evenly split between two non-majority opinions, but both sides agreed that the provision violated the First Amendment. *See Tam*, 137 S. Ct. at 1765. In *Iancu v. Brunetti*, 588 U.S. ___, 139 S. Ct. 2294 (2019), the Court considered another provision of section 2(a) of the Lanham Act, which directed the PTO to deny registration of marks that "consist[] of or comprise[] immoral . . . or scandalous matter," § 1052(a). Again, the Court held the provision unconstitutional. *See Brunetti*, 139 S. Ct. at 2302. The two opinions in *Tam* and the majority opinion in *Brunetti* each relied on a "core postulate of free speech law"—that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys"— and concluded that "[v]iewpoint discrimination doomed" the two provisions. *Id.* at 2299.

The provision of the Lanham Act involved in this case, section 2(c), prohibits registration of a trademark that

> [c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow.

§ 1052(c). Neither *Tam* nor *Brunetti* resolves the constitutionality of section 2(c). Both holdings were carefully cabined to the narrow, "presumptive[] unconstitutional[ity]" of section 2(a)'s viewpoint-based restrictions, *Brunetti*, 139 S. Ct. at 2299 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995)), and Elster agrees that section 2(c) does not involve viewpoint discrimination, Oral Arg. at 45:49–46:35. We nonetheless conclude that as applied in this case, section 2(c) involves content-based discrimination that is not justified by either a compelling or substantial government interest.

## II

While neither *Tam* nor *Brunetti* resolves this case, they do establish that a trademark represents "private, not government, speech" entitled to some form of First Amendment protection. *Tam*, 137 S. Ct. at 1760; *see Brunetti*, 139 S. Ct. at 2299. The cases also establish that trademarks often "do not simply identify the source of a product or service but go on to say something more" on "some broader issue." *Tam*, 137 S. Ct. at 1764 (Alito, J.). They frequently "have an expressive content" and can convey "powerful messages . . . in just a few words." *Id.* at 1760. Even though the government in the trademark area has not imposed an absolute prohibition on speech, *Brunetti* further established that denying trademark registration "disfavors" the speech being regulated. 139 S. Ct. at 2297, 2300. We recognize, as the government contends, that section 2(c) does not prevent Elster from communicating his message outright. But whether Elster is free to communicate his

message without the benefit of trademark registration is not the relevant inquiry—it is whether section 2(c) can legally disadvantage the speech at issue here.

The advantages of trademark registration are well known, including serving as "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce"; conferring "incontestable" status "once a mark has been registered for five years"; and enabling a mark holder to prevent the importation of goods "bearing an infringing mark" into the United States. *Tam*, 137 S. Ct. at 1753 (internal quotation marks omitted) (first quoting *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015); then quoting *id.* at 143; and then quoting 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 19:9, at 19–38 (4th ed. 2017)).

Nonetheless, the government argues that because trademark protection is the equivalent of a government subsidy, it is not subject to First Amendment scrutiny so long as viewpoint discrimination is not involved. This position has little support in the Supreme Court's opinions in *Tam* and *Brunetti*. Although the dissenting Justices in *Brunetti* suggested that trademark registration might be viewed as a condition on a government benefit, 139 S. Ct. at 2308, 2317 (Sotomayor, J. concurring-in-part and dissenting-in-part), Justice Alito's opinion in *Tam*, joined by three other Justices, stated that the "federal registration of a trademark is nothing like" government subsidy programs that provide cash benefits to private parties, and that cases addressing such programs are "not instructive in analyzing the constitutionality of restrictions on" trademarks, 137 S. Ct. at 1761 (Alito, J.). Justice Kennedy's concurring opinion in *Tam*, joined by the three remaining Justices, declined to address the government subsidy framework, suggesting it was not relevant. *Id.* at 1765, 1767 (Kennedy,

J.). And when *Tam* and *Brunetti* were before this court, we held that trademark registration is not a government subsidy. *See In re Tam*, 808 F.3d 1321, 1348–54 (Fed. Cir. 2015) (en banc); *In re Brunetti*, 877 F.3d 1330, 1342–45 (Fed. Cir. 2017).

In any event, even if a trademark were a government subsidy, this is not a situation in which First Amendment requirements are inapplicable. Elster's mark is speech by a private party in a context in which controversial speech is part-and-parcel of the traditional trademark function, as the Supreme Court decisions in *Tam* and *Brunetti* attest. Under such circumstances, the effect of the restrictions imposed with the subsidy must be tested by the First Amendment. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543, 547–48 (2001) (funding condition barring lawyers from challenging constitutionality of welfare laws violated the First Amendment); *see also FCC v. League of Women Voters*, 468 U.S. 364, 396–97 (1984) (funding condition preventing broadcasters receiving federal funds from editorializing held unconstitutional).

We are also not convinced by the government's argument that Lanham Act bars are comparable to speech restrictions in a limited public forum. To be sure, Justice Alito's opinion in *Tam*, joined by three other Justices, suggested that the limited public forum doctrine, which permits some viewpoint-neutral "content- and speaker-based restrictions," presented a "[p]otentially more analogous" framework than the subsidy theory. 137 S. Ct. at 1763 (Alito, J.). But this is not a case in which the government has restricted speech on its own property to certain groups or subjects, a fact distinguishing it from nearly all of the Supreme Court's limited public forum cases. *See In re Brunetti*, 877 F.3d at 1346 (citing cases). While a limited public forum need not be a physical place—it can be "metaphysical"—, our decision in *In re Brunetti* noted that when the Supreme Court has analyzed speech restrictions in

metaphysical forums, such restrictions were always "tethered to government properties" where the effects were later felt. *Id.* at 1347 (citing *Rosenberger*, 515 U.S. at 830). No similar situation exists for the trademark registration program because "refusals chill speech anywhere from the Internet to the grocery store." *Id.* at 1348. We are not dealing with speech in a limited public forum. The speech here is entitled to First Amendment protection beyond protection against viewpoint discrimination.

It is well established that speech ordinarily protected by the First Amendment does not lose its protection "because the [speech] sought to be distributed [is] sold rather than given away." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (first citing *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943); and then citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)); *see also Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996) ("[W]e see no principled distinction between speech and merchandise that informs our First Amendment analysis. The fact that expressive materials are sold neither renders the speech unprotected . . . nor alters the level of protection." (citations omitted)). Nor is expressive speech entitled to a lesser degree of protection because it is printed on a T-shirt. *See Cohen v. California*, 403 U.S. 15, 18 (1971) (holding that a jacket bearing the words "Fuck the Draft" is protected speech); *see also Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 804 (Cal. 2001) ("Nor does the fact that Saderup's art appears in large part on a less conventional avenue of communications, T-shirts, result in reduced First Amendment protection."); *Ayres v. City of Chicago*, 125 F.3d 1010, 1014 (7th Cir. 1997) ("The T-shirts that the plaintiff sells carry an extensive written message of social advocacy; . . . there is no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment.").

That trademarked speech is entitled to First Amendment protection and that the protection is not lost because of the commercial nature of the speech does not establish the relevant test. Whatever the standard for First Amendment review of viewpoint-neutral, content-based restrictions in the trademark area, whether strict scrutiny, *see Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (the restriction must be "narrowly tailored to serve compelling state interests"), or intermediate scrutiny, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) (the restriction must "directly advance[]" a "substantial" government interest), there must be at least a substantial government interest in the restriction. We proceed to examine the consequential First Amendment interests and the claimed government interests.

### III

The First Amendment interests here are undoubtedly substantial. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988) ("At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern."). Indeed, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

In particular, "the right to criticize public men" is "[o]ne of the prerogatives of American citizenship." *Baumgartner v. United States*, 322 U.S. 665, 673–74 (1944). Such criticism "does not lose its constitutional protection merely because it is effective criticism and hence diminishes [public figures'] official reputations." *N.Y. Times*, 376 U.S. at 273. To the contrary, the First Amendment "has its fullest and most urgent application" to speech concerning public officials. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). Laws suppressing the right "to praise or criticize governmental agents" generally cannot be squared with the First Amendment. *Mills*, 384 U.S. at 219.

The government appears to recognize that the section 2(c) restriction implicates First Amendment interests but contends that these interests are outweighed by the government's substantial interest in protecting state-law privacy and publicity rights, grounded in tort and unfair competition law. Those interests are defined in the relevant Restatements. The Restatement (Second) of Torts defines the tort of "Appropriation of Name or Likeness," as actionable when a tortfeasor "appropriates to his own use or benefit the name or likeness of another." Restatement (Second) of Torts § 652C (1977). The comments elaborate that the right, thought to be "in the nature of a property right," protects the "interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness." *Id.* at cmt. a. Recovery for appropriation also serves to "protect[] [an individual's] personal feelings against mental distress." *Id.*

The Restatement (Third) of Unfair Competition recognizes a separate cause of action that protects an individual's publicity rights. An unfair competition claim arises when a party "appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade." Restatement (Third) of Unfair Competition § 46 (1995).

The question here is whether the government has an interest in limiting speech on privacy or publicity grounds if that speech involves criticism of government officials—speech that is otherwise at the heart of the First Amendment.

IV

We consider first the claimed right of privacy. Here, there can be no plausible claim that President Trump enjoys a right of privacy protecting him from criticism in the absence of actual malice—the publication of false information "with knowledge of its falsity or in reckless disregard of the truth." *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967). The government cites no case authority or treatise that recognizes such an interest, and there is no claim here of actual malice. In such circumstances, when the restricted speech comments on or criticizes public officials, the government has no interest in disadvantaging the speech to protect the individual's privacy interests. This recognition goes back to the very origin of the right of privacy, as recognized by the Supreme Court in *Bartnicki v. Vopper*:

> As Warren and Brandeis stated in their classic law review article: 'The right of privacy does not prohibit any publication of matter which is of public or general interest.'

532 U.S. 514, 534 (2001) (quoting Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 214 (1890)).

In *Time*, the Supreme Court considered a New York privacy statute that permitted monetary recovery for "[a]ny person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without [] written consent," a provision quite similar in some respects to section 2(c) of the Lanham Act.

385 U.S. at 376 n.1.  A private individual sued Life Magazine after it published a story that falsely equated a play's plot with his family's experience of being held hostage by convicts in their suburban home.  *Id.* at 378–79.  The Court held that absent proof of actual malice, "constitutional protections for speech and press preclude[d]" recovery under the statute for "false reports of matters of public interest."  *Id.* at 387–88.

The majority in *Bartnicki* later understood *Time* as requiring that "privacy concerns give way when balanced against the interest in publishing matters of public importance."  532 U.S. at 534.  Those privacy concerns similarly must give way when the speech at issue references a public figure because public figures subject themselves to "greater public scrutiny and ha[ve] a lesser interest in privacy than an individual engaged in purely private affairs." *Id.* at 539 (Breyer, J., concurring); *see also id.* at 534 (majority opinion) ("One of the costs associated with participation in public affairs is an attendant loss of privacy.").  With respect to privacy, the government has no legitimate interest in protecting the privacy of President Trump, "the least private name in American life," Appellant's Br. 35, from any injury to his "personal feelings" caused by the political criticism that Elster's mark advances.

V

The asserted interest in protecting the right of publicity is more complex.  The government, of course, has an interest in protecting against copying or misappropriation of an existing mark, just as it has an interest in preventing misappropriation of other forms of intellectual property.  In *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 526 (1987), a case not cited in either party's briefs, the Supreme Court considered the constitutionality of a statute that granted the United States Olympic Committee ("USOC") "the right to prohibit certain

commercial and promotional uses of the word 'Olympic' and various Olympic symbols." The USOC sought to enjoin a nonprofit's use of "Gay Olympic Games" on letterheads and mailings used to promote a nine-day athletic event, as well as on T-shirts and other merchandise sold promoting the games. *Id.* at 525. The nonprofit urged that its use of "Gay Olympic Games" was protected First Amendment expression. *Id.* at 531–32. Focusing on the fact that the nonprofit's use of the word Olympic "sought to exploit [the word's] 'commercial magnetism'" and that the "image [the nonprofit] sought to invoke was exactly the image" the USOC "carefully cultivated," the Court held that it was valid for Congress to determine that these "unauthorized uses, even if not confusing, nevertheless may harm the USOC by lessening the distinctiveness and thus the commercial value of the mark," such that the statute was consistent with the First Amendment. *Id.* at 539–41. The holding did not address whether the statute could validly prohibit speech critical of the Olympics, and in dicta suggested that it was not "clear that [the statute] restricts purely expressive uses of the word." *Id.* at 536.

No similar claim is made here that President Trump's name is being misappropriated in a manner that exploits his commercial interests or dilutes the commercial value of his name, an existing trademark, or some other form of intellectual property. *See also Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 575–76 (1977) (holding that state law consistent with the First Amendment can create tort liability for appropriating an individual's performance rights).

The government, in protecting the right of publicity, also has an interest in preventing the issuance of marks that falsely suggest that an individual, including the

President, has endorsed a particular product or service.[1] But that is not the situation here. No plausible claim could be or has been made that the disputed mark suggests that President Trump has endorsed Elster's product. In any event, trademarks inaccurately suggesting endorsement in a manner that infringes the "right of privacy, or the related right of publicity" are already barred by section 2(a) of the Lanham Act,[2] a provision not invoked on appeal.[3] *See, e.g.*, *Bridgestone/Firestone Rsch., Inc. v. Auto. Club de l'Ouest de la Fr.*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) ("This protection of rights of personal privacy and publicity distinguishes the § 2(a) false suggestion of connection provision

---

[1]    This concern is also borne out by debates on section 2(c) evincing Congress's desire to prevent the use of presidential names to promote unsavory or other commercial products. *See, e.g.*, *Hearings on H.R. 9041 Before the Subcomm. on Trademarks of the House Comm. on Patents*, 75th Cong. 79 (1938) (statement of Rep. Lanham) ("I do not believe that George Washington should have his name bandied around on every commonplace article that is in ordinary use, because I think we have better ways of preserving the name and the fame of George Washington than in that manner."); *Hearings on H.R. 4744 Before the Subcomm. on Trademarks of the House Comm. on Patents*, 76th Cong. 18–19 (1939) (statement of Rep. Rogers) ("I quite agree that Abraham Lincoln gin ought not to be used, but I would not say the use of G. Washington on coffee should not be permissible.").

[2]    As stated previously, section 2(a)'s false association clause bars registration of trademarks that "falsely suggest a connection with persons, living or dead." § 1052(a).

[3]    We note that the Board did not address the examiner's rejection of Elster's proposed mark on section 2(a) grounds, and the government on appeal similarly did not raise section 2(a) as an alternative basis for affirming the Board's decision.

from the § 2(d) likelihood of confusion provision."); *Univ. of Notre Dame Du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 1376 (Fed. Cir. 1983) ("[Section] 2(a) was intended to preclude registration of a mark which conflicted with another's rights, even though not founded on the familiar test of likelihood of confusion.").

The right of publicity does not support a government restriction on the use of a mark because the mark is critical of a public official without his or her consent. The Restatement of Unfair Competition recognizes that challenges under state-law publicity statutes are "fundamentally constrained by the public and constitutional interest in freedom of expression," such that the "use of a person's identity primarily for the purpose of communicating information or expressing ideas is not generally actionable as a violation of the person's right of publicity." Restatement (Third) of Unfair Competition § 47 cmt. c.

Thus, for example, the Tenth Circuit held that parody baseball trading cards, including cards "featuring caricatures of political and sports figures" accompanied by "humorous commentary about their careers," constituted protected speech. *Cardtoons*, 95 F.3d at 962, 972. Although the cards appropriated the commercial value of the players' names and likenesses without their consent, the card producer had a "countervailing First Amendment right to publish the cards" because the use of parody "provide[d] social commentary on public figures," "an especially valuable means of expression." *Id.* at 968–69, 972.

> [C]elebrities with control over the parodic use of their identities would not use the power to 'ration the use of their names in order to maximize their value over time[.]' . . . They would instead use that power to suppress criticism, and thus permanently remove a valuable source of information about their identity from the marketplace.

*Id.* at 975.

The California Supreme Court similarly concluded that there is no right to restrict dissemination of a public figure's likeness when the publication is intertwined with parody or critical speech:

> [T]he right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals. Once the celebrity thrusts himself or herself forward into the limelight, the First Amendment dictates that the right to comment on, parody, lampoon, and make other expressive uses of the celebrity image must be given broad scope.

*Comedy III*, 21 P.3d at 807;[4] *see also Titan Sports, Inc v. Comics World Corp.*, 870 F.2d 85, 88 (2d Cir. 1989) ("[A] court must be ever mindful of the inherent tension between the protection of an individual's right to control the use of his likeness and the constitutional guarantee of free dissemination of ideas, images, and newsworthy matter in whatever form it takes."); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 938 (6th Cir. 2003) (holding prints of Tiger Woods reflecting his likeness constituted protected, creative expression in the face of a right of publicity challenge); *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 170 (3d Cir. 2013) (finding use of a football player's photo in a video game that "imbue[d] the image with additional meaning beyond simply being a representation of a player," was "shielded by the First Amendment"). New York courts have also recognized judicial exceptions to the state's right of publicity

---

[4]    The court ultimately allowed the plaintiff to recover on its right of publicity claim because the disputed T-shirt created a "literal, conventional depiction[] of The Three Stooges so as to exploit their fame." *Comedy III*, 21 P.3d at 811.

statute for "newsworthy events or matters of public interest," "works of humor," "art," "fiction, and satire." *Lohan v. Take-Two Interactive Software, Inc.*, 97 N.E.3d 389, 393 (N.Y. 2018).

The right of publicity is particularly constrained when speech critical of a public official is involved. The Restatement specifically notes that the right of publicity would be unavailable to "a candidate for public office" who sought to "prohibit the distribution of posters or buttons bearing the candidate's name or likeness, whether used to signify support or opposition." Restatement (Third) of Unfair Competition § 47 cmt. b. Similarly, in *Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 508–09 (Sup. Ct. 1968), a comedian who had initiated a presidential campaign could not enjoin the distribution of mocking campaign posters bearing his likeness because the poster communicated "constitutionally protected" political speech that "must supersede any private pecuniary considerations."

The government has no valid publicity interest that could overcome the First Amendment protections afforded to the political criticism embodied in Elster's mark. As a result of the President's status as a public official, and because Elster's mark communicates his disagreement with and criticism of the then-President's approach to governance, the government has no interest in disadvantaging Elster's speech.

Contrary to the government's claim that section 2(c) merely "involves a targeted effort to preclude federal registration that facilitates a particular type of commercial behavior that has already been banned by most states," Gov't Br. 1, our review of state-law cases revealed no authority holding that public officials may restrict expressive speech to vindicate their publicity rights, and the government cites no such cases. In fact, every authority that the government cites reaches precisely the opposite conclusion,

recognizing that the right of publicity cannot shield public figures from criticism. *See generally* 1 J. Thomas McCarthy, *The Rights of Publicity & Privacy* § 2:4 (2d ed. 2020) ("Every personal and property right must peacefully co-exist within the confines of the free speech policies of the First Amendment.").[5]

In short, whether we apply strict scrutiny and the compelling government interest test, or *Central Hudson's*

---

[5]     The one case the government cites involving parody or criticism of public figures held that a parody baseball card producer's use of MLB players' names and likenesses was not actionable under a right of publicity statute. *See Cardtoons*, 95 F.3d 959.

Most of the cases the government cites upholding the right of publicity involve a routine use of a public figure's name or likeness to promote a product or the misappropriation of the commercial value of their identity. *Zacchini*, 433 U.S. 562 (broadcaster airing human cannonball performer's entire act); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014) (advertisement incorporating Michael Jordan's name to promote grocery store); *Hart*, 717 F.3d 141, (video game using college football players' photos and likenesses); *Bridgestone*, 245 F.3d 1359 (tire manufacturer using French brand name on tires); *Bi-Rite Enters., Inc. v. Bruce Miner Co.*, 757 F.2d 440 (1st Cir. 1985) (posters depicting British rock group); *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir. 1983) (toilet manufacturer incorporating entertainer's "here's Johnny" catchphrase); *Univ. of Notre Dame Du Lac*, 703 F.2d 1372 (cheese importer using same brand name as university); *Haelan Lab'ys, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir. 1953) (chewing-gum producer using athlete's photo to promote product); *Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719 (Tex. Civ. App. 1975) (Coca-Cola advertisement using football player's photo).

intermediate scrutiny and the substantial government interest test, "the outcome is the same." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). The PTO's refusal to register Elster's mark cannot be sustained because the government does not have a privacy or publicity interest in restricting speech critical of government officials or public figures in the trademark context—at least absent actual malice, which is not alleged here.

## VI

As Elster raised only an as-applied challenge before this court, *see, e.g.*, Appellant's Br. 4; Oral Arg. 5:09–5:14, we have no occasion to decide whether the statute is constitutionally overbroad. We note, however, that section 2(c) raises concerns regarding overbreadth.

The First Amendment overbreadth doctrine recognizes that "a law may be overturned as impermissibly overbroad" when "a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted) (quoting *New York v. Ferber*, 458 U.S. 747, 769–71 (1982)). It may be that a substantial number of section 2(c)'s applications would be unconstitutional. The statute leaves the PTO no discretion to exempt trademarks that advance parody, criticism, commentary on matters of public importance, artistic transformation, or any other First Amendment interests. It effectively grants all public figures the power to restrict trademarks constituting First Amendment expression before they occur.[6] In

---

[6]    As interpreted by the PTO, section 2(c) has limited application to private individuals because it requires consent only if: "(1) the person is so well known that the public would reasonably assume a connection between the person and the goods or services; or (2) the individual is publicly

*Tam*, Justice Alito, joined by three other Justices, characterized as "far too broad" a statute that would bar the trademark "James Buchanan was a disastrous president." 137 S. Ct. at 1765 (Alito, J.).  Nonetheless, we reserve the overbreadth issue for another day.

### CONCLUSION

For the foregoing reasons, we hold that the Board's application of section 2(c) to Elster's mark is unconstitutional under any conceivable standard of review, and accordingly reverse the Board's decision that Elster's mark is unregistrable.

**REVERSED**

---

connected with the business in which the mark is used." *In re ADCO Indus. Techs., L.P.*, 2020 U.S.P.Q.2d 53786, 2020 WL 730361, at *10 (T.T.A.B. 2020).