RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

BILLY ISON; SANDRA ISON; ABBY ISON; CAROLYN DELL PATRICK,

          *Plaintiffs-Appellants*,

    *v*.

MADISON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION,

          *Defendant-Appellee*.

No. 20-4108

─────────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00155—Michael R. Barrett, District Judge.

Argued:  June 9, 2021

Decided and Filed:  July 7, 2021

Before:  GIBBONS, COOK, and DONALD, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Jennifer M. Kinsley, KINSLEY LAW OFFICE, Cincinnati, Ohio, for Appellant. Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee.  **ON BRIEF:**  Jennifer M. Kinsley, KINSLEY LAW OFFICE, Cincinnati, Ohio, Matthew Miller-Novak, BARRON PECK BENNIE & SCHLEMMER CO., LPA, Cincinnati, Ohio, for Appellant.  Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, Brodi J. Conover, FROST BROWN TODD LLC, West Chester, Ohio, for Appellee.

————————————

**OPINION**

————————————

COOK, Circuit Judge.   After a shooting in the Madison Local School District, plaintiffs Carolyn Patrick and Billy, Abby, and Sandra Ison frequently appeared at School Board meetings to criticize the Board's handling of gun-related issues.   The Board twice prevented them from speaking for failing to comply with its Public Participation Policy.   The Isons and Ms. Patrick sued, asserting that the Board violated their First Amendment rights in those two instances and that portions of the Policy, as written, also violate the First Amendment.   The district court granted the Board summary judgment and the Isons and Ms. Patrick appeal.   We REVERSE in part and AFFIRM in part.

**I.**

In February 2016, a Madison student fired a gun and injured four students, sparking years of controversy surrounding safety in Madison schools.   Approximately two years after the shooting, the Board enacted a resolution allowing staff to carry concealed weapons.   (Around the same time, Madison students walked out of class during the school day to protest gun violence; school administration disciplined those students.  Perturbed by these developments, the Isons and Ms. Patrick took to attending Board meetings.

The Board allots time for community members to speak during each meeting.   In order to "conduct[] its meetings in a productive and efficient manner that assures that the regular agenda of the Board is completed in a reasonable period of time . . . and allows for a fair and adequate opportunity for input to be considered," the Board enacted a Public Participation Policy.   Per the Policy, those wishing to participate must complete a "public participation form," in person, at least two business days before the meeting.   Only Madison residents may participate, and they must limit their speaking time to three minutes.   Participants must address the presiding officer, not Board members individually.   The Policy authorizes the presiding officer to:

1. prohibit public comments that are frivolous, repetitive, and/or harassing;

2. interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, off-topic, antagonistic, obscene, or irrelevant;

3. request any individual to leave the meeting when that person does not observe reasonable decorum; [and]

4. request the assistance of law enforcement officers in the removal of a disorderly person when that person's conduct interferes with the orderly progress of the meeting.

(R. 33-1 at PageID #: 658.)

In March 2018, the Isons and Ms. Patrick attended the first meeting where the Board discussed arming teachers and the student protest. Billy tried to speak but learned upon arrival that the Policy required preregistration. At the next meeting, the Board passed the armed staff resolution. The Isons, having preregistered, each expressed their disdain for the new resolution and the punishment of student protestors. Board President David French responded to their criticism, emphasizing the Board's effort to create a safe learning environment for all students and their commitment to remaining neutral on political issues.

The Isons spoke again at the next meeting (May 2018). A video of Billy Ison's remarks there shows him turning to address the room and reading from a prepared speech, accusing the Board of "threaten[ing]" the school to punish the student protestors. He calls the Board's justification offered at the prior meeting for punishing "a smokescreen intended to conceal their true motivation . . . to suppress all opposition to pro-gun views" and "push its pro-gun agenda." And it depicts him accusing the Board of "taking a very strong position on guns" when it decided to arm staff.

The Board interrupted Billy twice during his remarks. First, French asked Billy not to use the word "threatening." Second, after Billy accused the Board of concealing their "true motivation" for punishing students, another Board member asked him to stop "putting words in [the Board's] mouth" and saying things "that are not facts." French then asked Billy to stop and warned that if he continued, security would escort him out. Billy continued, finishing his speech while a security officer escorted him calmly from the room. In total, he spoke just under three

minutes.  As French later recalled the incident, Billy "was being basically unruly, not following the rules, being hostile in his demeanor."  He let Billy speak "until other people were starting to object and getting offen[d]ed by it."

The next problem for these plaintiffs developed when Billy completed a form in anticipation of the January 2019 Board meeting expecting that it would authorize participation by Ms. Patrick, Abby, and Sandra, as well as him.  But when they arrived at the meeting, the Board allowed only Billy to speak, because the others failed to submit their own forms.

## II.

The Isons and Ms. Patrick sued the Board, invoking 42 U.S.C. § 1983 to challenge under the First Amendment the Policy's "use of vague and undefined terms" and "the imposition of content-based restrictions on speech."  They seek compensatory damages, a declaration that the Board's restrictions violate the Constitution, and an injunction barring enforcement of the Board's Policy.

The Board and Plaintiffs filed cross motions for summary judgment.  Having heard oral argument and finding no First Amendment violation, the district court granted summary judgment to the Board.  Plaintiffs appeal.

Plaintiffs' arguments on appeal fall into three categories.  First, they challenge the Policy's restrictions on "personally directed," "abusive," and "antagonistic" statements, and the application of those restrictions to prevent Billy from speaking at the May 2018 meeting. Second, they challenge the in-person preregistration requirement and the Board's application of that requirement to prevent Abby, Sandra, and Ms. Patrick from speaking at the January 2019 meeting.  Third, they challenge the Policy—and the Board's discretion in implementing it—as unconstitutionally vague.

## III.

We review a district court's grant of summary judgment de novo.  *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416 (6th Cir. 2020).  A court appropriately grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The parties agreed below that no factual dispute exists, but where, as here, the parties present video evidence, we "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

**IV.**

The First Amendment, applicable to the states through the Fourteenth, prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I.  The strength of the First Amendment protection, and the level of justification required for a speech restriction, varies depending on the forum where the speech occurs.  *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010).  The parties here agree that the Board meetings constitute a "limited public forum," meaning it "is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).

In a limited public forum, the government may "regulate features of speech unrelated to its content" through "time, place, or manner" restrictions.  *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).  It has "wide[] leeway" to do so, and those restrictions survive if "they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The government may also impose content-based restrictions, such as those reserving the forum "for certain groups or for the discussion of certain topics," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), so long as they "are reasonable in light of the purpose served by the forum and are viewpoint neutral," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  But "the government may not engage in a more invidious kind of content discrimination known as 'viewpoint discrimination.'" *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 491 (6th Cir. 2020) (quoting *Rosenberger*, 515 U.S. at 829); *see also Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 519 (6th Cir. 2019).  Impermissible viewpoint discrimination "does not neutrally treat

an entire subject as off limits," but rather "permits some private speech on the subject and only disfavors certain points of view." *Am. Freedom Def. Initiative*, 978 F.3d at 498.

**A.**

First, we consider the Board Policy's restrictions on "abusive," "personally directed," and "antagonist" statements. Plaintiffs urge that these restrictions, as written, violate the First Amendment by discriminating on viewpoint and that the Board unconstitutionally applied the restrictions to silence Billy.

For the facial challenge, we look to the Policy's text and determine whether it unconstitutionally burdens speech. *See Speet v. Schuette*, 726 F.3d 867, 871–73 (6th Cir. 2013). Though the Policy contains no definitions, President French testified that the Board interprets "abusive" to mean "hostile to one's feelings or towards [sic] in your manner of speech"; "antagonistic" to mean "to antagonize with hostility toward oneself or one's person[;] . . . being hostile to people"; and "personally directed" to mean "either harassing [or] abusive statements directed at someone individually." (R. 31-3 at PageID #: 471.) This matches common dictionary definitions. *See Abusive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/abusive ("harsh and insulting"); *Antagonistic*, Merriam-Webster, https://www.merriam-webster.com/dictionary/antagonistic ("showing dislike or opposition"); *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2299–300 (2019) (utilizing Patent and Trademark Office interpretation and dictionary definition to determine terms' meanings for First Amendment challenge). Plaintiffs argue that two recent Supreme Court cases, *Matal v. Tam*, 137 S. Ct. 1744 (2017) and *Iancu*, 139 S. Ct. 2294, clarify that these regulations are viewpoint based and thus unconstitutional. We agree.

In *Matal*, the Court struck down the Lanham Act's prohibition on federal registration of trademarks that "'disparage . . . or bring . . . into contemp[t] or disrepute' any 'persons, living or dead.'" 137 S. Ct. at 1751 (alterations in original) (quoting 15 U.S.C. § 1052(a)). Though split between two plurality opinions, all Justices agreed that the "anti-disparagement" clause discriminated based on viewpoint because "[g]iving offense is a viewpoint." *Id.* at 1763 (Alito, J., opinion). The *Iancu* Court struck down another Lanham Act restriction on "immoral or

scandalous" marks, finding it "permit[ted] registration of marks that champion society's sense of rectitude and morality, but not marks that denigrate those concepts." 139 S. Ct. at 2299. It reasoned that the act impermissibly "distinguishe[d] between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation." *Id.* at 2300. In short, these cases stand for the proposition that the government may not censor speech merely because it is "offensive to some." *Matal*, 137 S. Ct. at 1763 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)).

Our cases clarify the impact of *Matal* and *Iancu*. In *Youkhanna*, we surmised, albeit in dicta, that, in light of *Matal*, a rule against "attacks on people or institutions" during the public comment portion of a city council meeting "could be construed as viewpoint discrimination." 934 F.3d at 518–20.[1] And then in *American Freedom Defense Initiative*, we went further and relied on *Matal* and *Iancu* to strike down a restriction prohibiting buses from running ads "likely to hold up to scorn or ridicule any person or group of persons." 978 F.3d at 500. We found that the restriction "necessarily discriminates between viewpoints" because "[f]or any group, the restriction facially 'distinguishes between two opposed sets of ideas': those that promote the group and those that disparage it." *Id*. (quoting *Iancu*, 139 S. Ct. at 2300). So too here.

The antagonistic restriction, by definition, prohibits speech opposing the Board. *See Antagonistic*, Merriam-Webster ("showing dislike or opposition"). And abusive prohibits "insulting" language, *see Abusive*, Merriam-Webster ("harsh and insulting"), with "personally directed," meaning simply abusive speech directed at one person, per the Board's interpretation. These terms plainly fit in the "broad" scope of impermissible viewpoint discrimination because, like in *Matal*, *Iancu*, and *American Freedom Defense Initiative*, they prohibit speech purely because it disparages or offends. *See Matal*, 137 S. Ct. at 1763. Indeed, President French testified that giving offense sufficed, under the Policy, to prevent someone from speaking. (*See*

---

[1]This is not to say that we decide today that regulations guarding against actual ad hominem *attacks*, even verbal, are not permitted in a limited public forum. Suffice it to say that speaking out in opposition to an idea may be offensive but is easily distinguishable from a personal attack. *See Bible Believers v. Wayne County*, 805 F.3d 228, 246−47 (6th Cir. 2015) (en banc) (distinguishing between generally offensive statements and "insult or offense" directed specifically at an individual).

R. 31-3 at PageID #: 493 ("If [the speech is] perceived to be particularly offensive or abusive, then yes, I would stop [the speaker.]")).

The Board invokes *Lowery v. Jefferson County Board of Education*, 586 F.3d 427 (6th Cir. 2009), a pre-*Matal* and *Iancu* case, to resist this conclusion. In *Lowery*, our court considered a challenge to a school board public participation policy restricting "frivolous, repetitive, [and] harassing" statements. *Id*. at 433. We rejected the challenge, finding those restrictions "'justified without reference to the content' of the speech" and therefore content-neutral. *Id*. (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Though we elaborated little on the finding of content-neutrality for each of these terms when discussing the facial challenge, we reasoned later in the opinion that "harassment" often overlaps with "repetitiveness," thereby avoiding impermissible viewpoint discrimination. *See id*. at 435. Indeed, we cautioned that interpreting "harassing" to "exclude speech merely because it criticizes school officials," would constitute viewpoint discrimination. *Id*. This sets *Lowery* apart from the case here.[2] The restrictions on "antagonistic," "abusive" and "personally directed" speech prohibit speech because it opposes, or offends, the Board or members of the public, in violation of the First Amendment. To hold otherwise and expand *Lowery* as the Board suggests would run afoul of *Matal* and *Iancu*.

This likewise settles Plaintiffs' as-applied challenge because President French testified that he stopped Billy's speech when he started offending people. (R. 31-3 at PageID #: 481 ("And then when it came to a point where . . . he was personally attacking and people were getting offended . . . I stopped him.")) Video evidence confirms that another Board member's taking offense to Billy's comments prompted his removal, after French interrupted him initially for accusing the Board of "threatening" school administration. French later clarified that he stopped Billy because he found his speech "hostile," "personally directed," and "abus[ive.]" The video contradicts much of French's testimony. Billy spoke calmly, used measured tones, and refrained from personal attacks or vitriol, focusing instead on his stringent opposition to the

---

[2]It is also worth noting that in *Lowery* we affirmed a jury verdict in favor of the school board, finding that "the jury had ample bases for concluding that any potential viewpoint-based motives of the board did not affect" its ultimate decision. *Id*. at 435. Here, on the other hand, we are asked to decide that as a matter of law the Board's policy is viewpoint-neutral despite singling out oppositional speech.

Board's policy and his belief that the Board was not being honest about its motives. While not directly relevant to our decision as to Plaintiffs' as-applied challenge, the application to Billy is useful evidence of the Board's interpretation of the regulations. Having already found the "abusive" and "personally directed" restrictions facially unconstitutional, their application to Billy's comments also constitutes impermissible viewpoint discrimination. Accordingly, the Policy's restrictions on abusive, personally directed, and antagonistic speech, facially and as-applied, violate the First Amendment. Since the parties have not briefed the proper remedy for these violations, we leave that issue for the district court on remand. *See Am. Freedom Def. Initiative*, 978 F.3d at 501–02.

**B.**

Second, the preregistration requirement. All agree that this is a content-neutral restriction and so qualifies as a time, place, manner restriction. Accordingly, it need only narrowly serve a significant government interest and leave ample alternative channels. *Ward*, 491 U.S. at 791–92. Plaintiffs press that requiring speakers to register in person prior to Board meetings furthers no government interest. The Board, however, convincingly argues that the in-person requirement "allows the Board to reserve time for those individuals who are most likely to follow through and participate in the meeting" and "helps to ensure that those who truly want to participate are not denied the opportunity to do so." Evidence shows that the Board previously faced problems with individuals registering to speak then not appearing for the meeting. This satisfies the government-interest prong. *See Lowery*, 586 F.3d at 433 ("Unstructured, chaotic school board meetings not only would be inefficient but also could deny other citizens the chance to make their voices heard.").

And preregistration narrowly serves that interest. Narrow tailoring here requires not "the least restrictive or least intrusive means" of serving a government interest, *Ward*, 491 U.S. at 798, but only that the government's interest "would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *United States v. Albertini,* 472 U.S. 675, 689 (1985)). We may not invalidate a time, place, manner regulation merely because we disagree with the legislature on the "most appropriate method for promoting [its] interest[]," but regulations cannot "burden substantially more speech than is necessary." *Id.* at 799–800.

The Policy requires speakers to register at least two days before a meeting, in person, during Board hours (8:00 a.m. to 3:00 p.m.). To be sure, this can curtail a working person from easily registering, (*see e.g.*, R. 31-5, Sandra Ison Dep., PageID #: 537 (saying that in order to register in person she would have to "take time off work, fill out a form in person in the board of education office, show [her] identification, receive a time-stamped form back, and then show up later to speak at the meeting")), but that hurdle falls short of rendering the requirement *substantially* more burdensome than necessary. It cannot be argued to be a "wholesale ban," *cf. Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 388 (6th Cir. 1996), and it relates to the government's articulated interest, *cf. Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168–69 (2002); *Miller v. City of Cincinnati*, 622 F.3d 524, 536 (6th Cir. 2010).

Those who cannot comply with the preregistration requirement have ample alternative channels to communicate with the Board, through their publicly displayed e-mail addresses or at other school functions. The facial challenge to the preregistration requirement fails.

As to the as-applied challenge, Plaintiffs contend the Board unconstitutionally required in-person preregistration to prevent Sandra, Abby, and Ms. Patrick from sharing their views at the January 2019 meeting. As they tell it, the Board changed its Policy to require forms from each person to silence Plaintiffs' viewpoint. But the Policy always read: "Attendees must register *their* intention to participate in the public portion of the meeting." (R. 29-5 at PageID #: 381 (emphasis added).) That the Board started strictly enforcing this Policy when Plaintiffs began vehemently opposing the armed staff policy may frustrate Plaintiffs, but we hesitate to "make First Amendment-related speculations on the hidden motives of legislative bodies." *Ater v. Armstrong*, 961 F.2d 1224, 1229 (6th Cir. 1992). The district court properly granted summary judgment on these claims.

## C.

Last, Plaintiffs ask the court to strike down the Policy as unconstitutionally vague. In essence, they challenge the presiding officer's discretion, contending that "reasonable decorum," "abusive," and "antagonistic" can "change from day to day" depending on the Board's approach.

We review only the presiding officer's discretion in interpreting "reasonable decorum," having earlier struck the "abusive" and "antagonistic" restrictions. Though the exact contours of "reasonable decorum" lack precision, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794; *see also Lowery*, 586 F.3d at 436 (declining "to fault the board for its written policy even if it failed to anticipate every detail of what would and would not be allowed at meetings"). The district court properly granted the Board summary judgment on this claim.

## V.

We AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.