RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0244p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

────────────────

MOMS FOR LIBERTY - WILSON COUNTY, TENNESSEE; ROBIN LEMONS;
AMANDA DUNAGAN-PRICE,

*Plaintiffs-Appellants*,

*v.*

No. 24-5056

WILSON COUNTY BOARD OF EDUCATION, dba Wilson County
Schools; JAMIE FAROUGH, individually and in her official capacity as
the Chair and member of the Wilson County Board of Education;
KIMBERLY MCGEE, in her official capacity as the Vice Chair and
member of the Wilson County Board of Education; MELISSA LYNN,
BETH MEYERS, JOSEPH PADILLA, GREG HOHMAN, and DONNIE SELF,
in their official capacities as members of the Wilson County Board of
Education,

*Defendants-Appellees*.

────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:23-cv-00211—Eli J. Richardson, District Judge.

Argued: October 29, 2024

Decided and Filed: September 9, 2025

Before: STRANCH, THAPAR, and MURPHY, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Brett R. Nolan, INSTITUTE FOR FREE SPEECH, Washington, D.C., for
Appellants. Christopher C. Hayden, SELLERS, CRAIG, AND HAYDEN, INC., Jackson,
Tennessee, for Appellees. **ON BRIEF:** Brett R. Nolan, INSTITUTE FOR FREE SPEECH,
Washington, D.C., John I. Harris, SCHULMAN, LEROY & BENNETT PC, Nashville,
Tennessee, for Appellants. Christopher C. Hayden, SELLERS, CRAIG, AND HAYDEN, INC.,
Jackson, Tennessee, for Appellees.

STRANCH, J., delivered the opinion of the court in which THAPAR and MURPHY, JJ.,
concurred. THAPAR, J. (pp. 20–23), delivered a separate concurring opinion in which
MURPHY, J., concurred.

_____

**OPINION**

_____

JANE B. STRANCH, Circuit Judge.  This suit, brought under 42 U.S.C. § 1983, relies on the First Amendment's Free Speech Clause to challenge rules governing public comments at a school board's public meetings.  During regularly scheduled meetings, the Wilson County Board of Education permits public comments that comply with the Board's rules, which are set forth in Policy 1.404 and the script the Board's Chair reads at the beginning of each public comment period.  Robin Lemons, Amanda Dunagan-Price, and Moms for Liberty — Wilson County, TN (the "Wilson County Chapter") challenged three of those rules on First Amendment grounds and moved the district court to enjoin them while the case proceeded.  The district court denied Plaintiffs' motion for a preliminary injunction.  For the following reasons, we **AFFIRM** the district court's order and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  The Board's Rules

The Wilson County Board of Education is charged with administering public schools in Wilson County, Tennessee.  In line with its Policy Manual, the Board holds monthly school board meetings.  Tennessee law dictates that the Board's Chair preside over all school board meetings, Tenn. Code Ann. § 49-2-205(a)(1), and that, absent state or constitutional law instructing otherwise, those meetings shall be open to the public, *id.* § 8-44-102(a).

The Board routinely hears public comment during its meetings.  To provide public comment, individuals must comply with Policy 1.404, which specifies that "[a]ny matter relating to the operation of the school system may be appealed to the Board."  R. 17-4, Ex. B, PageID 131.  However, to facilitate settlement of all matters "at the lowest level of responsibility," the Board "will not hear complaints or concerns which have not advanced through the proper administrative procedure from the point of origin."  *Id.*  "If all [the] steps of the administrative procedure have been pursued and there is still a desire to appeal to the Board, the matter shall be

referred in writing to the office of the Director of Schools and the Board shall determine whether to hear the appeal." *Id*.

Policy 1.404 also dictates how the Board determines whether to hear public comments and provides three avenues through which a member of the public may address the Board. The first avenue permits a person "desiring to appear before the Board [to] . . . submit a written request with descriptive materials to the office of the Director of Schools ten (10) working days before the scheduled regular [s]chool [b]oard meeting." *Id.* "If the request is approved," an item will be placed on the Board's meeting agenda and the person will be allotted time to speak. *Id.* The second avenue permits a would-be speaker wishing to provide comment on a topic already on the agenda to "sign up . . . or make a request to any Board Member before the beginning of [any] Board [m]eeting" after the agenda is published. *Id*. The third and final avenue allows the Chair or another Board Member to recognize a person "for remarks to the Board [on a non-agenda item] if he/she determines that such is in the public interest." *Id*. This public-interest provision applies only to speakers who failed to meet the requirements of the first two avenues for addressing the Board. Regardless of the avenue pursued, Policy 1.404 also requires each speaker to state his or her name and address when speaking to the Board.

At the beginning of each public comment period, the Chair reads aloud from a script that includes additional rules for addressing the Board. Generally, the Chair also offers to reread the script before each speaker addresses the Board. The iteration of the script at issue here stated:

> Please state your name, address, and subject of your presentation. Your topic must be specific in nature dealing with only policies and procedures. We reserve the right to terminate remarks at any time if you fail to adhere to the guidelines or [if] your comments become abusive to an individual [B]oard [M]ember[,] the [B]oard as a whole[,] . . . the [D]irector of [S]chools[,] or any employee of the school system. . . . At the conclusion of your remarks, the [B]oard and the Director of Schools shall have the privilege to ask questions.

R. 1, Compl., PageID 8. Neither Policy 1.404 nor any other formal Board policy contains the restriction on abusive comments included in the Chair's script.

**B.  Plaintiffs' Public Comments**

Moms for Liberty is a national organization whose members seek to influence public education policy at all levels of government.   Moms for Liberty, *About Us*, https://momsforliberty.org/about/.   Amanda Dunagan-Price chairs the organization's Wilson County Chapter, which she founded in 2021 after the Board, in her view, mismanaged its response to the Covid-19 pandemic and introduced an "overly political curriculum."   R. 1, Compl., PageID 10.

Dunagan-Price avers that she has either attended or watched a recorded video of many of the Board's monthly meetings and has provided public comment several times since May 2021. Her comments have focused on removing certain books from school libraries, and the Board has permitted her to speak for her full allotted time each time without interruption.   However, Dunagan-Price avers that she: (1) "do[es] not know what 'abusive' means" in the Chair's script and "worrie[s] that a Board of Education [M]ember would take offense from [her] comments and stop [her] from speaking," R. 17-2, Dunagan-Price Decl., PageID 124; (2) has withheld her harshest criticisms of the Board, school administrators, and school policies out of fear that the Board or one of its Members will invoke the abusive-comments restriction in the Chair's script to prevent her from speaking; (3) fears repercussions for her statements on controversial issues and has therefore chosen to disclose her school district's zone number rather than her home address; and (4) as a result, worries that Board Members will invoke the address-disclosure requirement in the Chair's script and Policy 1.404 to prevent her from speaking at its meetings.

Robin Lemons, the secretary of the Wilson County Chapter, joined in early 2022 out of similar concerns with the Board's curriculum.   Lemons attended several Board meetings and decided to speak at one held on October 3, 2022.   Prior to the meeting, she contacted Board Member Joseph Padilla for permission to speak on a non-agenda item.   Padilla granted Lemons's request.   At the beginning of the public comment period, the Chair read aloud from the script excerpted above, and when Lemons approached the podium to address the Board, the Chair asked if Lemons would like the script to be read to her.   Lemons declined.   The Chair then asked for her name and address, and, although Lemons gave her name, she refused to share her address.

Lemons then began to describe an incident where her daughter was asked by another fourth-grade girl to meet her in the school bathroom to "do sex." About 45 seconds into Lemons's allotted time, the county attorney interrupted to ask whether the matter had been referred to the appropriate agency, and, when the attorney heard that the Department of Child Services was still conducting its investigation, he stated that the matter did not need to be discussed openly at the meeting. The ongoing investigation likely implicated Policy 1.404's requirement that all appeals must be "advanced through the proper administrative procedure from the point of origin" before being brought to the Board. Lemons then criticized the Director of Schools, Jeff Luttrell, for his alleged mishandling of the matter. The Chair interrupted, saying, "Ms. Lemons, you also refused to adhere to the guidelines of giving your address, so we've asked you to stop talking today, because there's, from my understanding there's more than one [student] involved. And so we've asked that you stop, for now, and let this process continue." Lemons then returned to her seat.

Like Dunagan-Price, Lemons and other members of the Wilson County Chapter allege that they intend to continue to address the Board but have refrained from doing so or altered their speech because they do not want to disclose their addresses out of fear of reprisal from those who may disagree with their criticisms and because the Chair may censor them pursuant to the abusive-comments restriction.

### C. Procedural History

In March 2023, the Wilson County Chapter, Dunagan-Price, and Lemons filed suit alleging violations of 42 U.S.C. § 1983 on First Amendment grounds against the Board and its Members, challenging the public-interest provision in Policy 1.404, the address-disclosure requirement, and the abusive-comments restriction in the script read at Board meetings. Soon afterwards, Plaintiffs moved to preliminarily enjoin Defendants from enforcing those rules. In support of their motion, Plaintiffs filed declarations from both Dunagan-Price and Lemons reiterating their experiences as detailed in the Complaint, excerpts of the Board's rules, and several recorded videos of school board meetings. The Board subsequently removed all mention

of the address-disclosure requirement and abusive-comments restriction from its policies and materials.

In January 2024, the district court denied Plaintiffs' motion without a hearing, concluding that Plaintiffs had not demonstrated a likelihood of success on the merits for their challenges to the public-interest provision, or a likelihood of imminent and irreparable harm from either the address-disclosure requirement or the abusive-comments restriction. As to the public-interest provision, the court concluded that Plaintiffs had not demonstrated a likelihood of success because the provision was susceptible to two plausible readings, one of which the court found likely to survive First Amendment scrutiny. As for the address-disclosure requirement and abusive-comments restriction, the court found that there was not a likelihood of irreparable harm because there was no evidence that Defendants would enforce either abrogated rule while the case continued. Plaintiffs timely appealed pursuant to our jurisdiction over denials of injunctive relief. *See* 28 U.S.C. § 1292(a)(1).

## II. ANALYSIS

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the government, including state government entities, from "abridging the freedom of speech." U.S. Const. amend. I. When a would-be speaker uses government property as the platform for her speech, the strength and scope of the First Amendment's protection depends on the forum where that speech occurs. *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021). For instance, in nonpublic fora like military bases, airport terminals, and internal mail systems, the government has broad discretion to regulate speech. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678–80 (1992); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803–05 (1985); *Greer v. Spock*, 424 U.S. 828, 835–37 (1976). Regulations in these places need only be reasonable and viewpoint-neutral. *Cornelius*, 473 U.S. at 806. On the other side of the spectrum are traditional and designated public fora. Traditional public fora are those like public parks, streets, and other areas "which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public

questions.'" *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). In such places, members of the public retain "strong free speech rights." *Id.* Designated public fora are government properties that have not traditionally been regarded as public fora but are intentionally made available for that purpose. *Id.* In both categories of public fora, the government may impose reasonable limits on the time, place, and manner of speech, but any other content-based restriction must both be viewpoint-neutral and satisfy strict scrutiny. *Id.*

Sitting somewhere on this spectrum between public fora and nonpublic fora are limited public fora: those created by a government entity for "use by certain groups or dedicated solely to the discussion of certain subjects." *Id.* at 470. In a limited public forum, like a public forum, the government may regulate speech through content-neutral time, place, and manner restrictions, so long as those restrictions are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication of the information. *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009). But the government may also impose content-based restrictions that are both viewpoint-neutral and reasonable in light of the purposes served by the forum. *Ison*, 3 F.4th at 893.

In *Lowery*, we concluded that school board meetings that allot time for public comment constitute limited public fora. 586 F.3d at 432; *see also Ison*, 3 F.4th at 893 (same). "While this type of meeting offers citizens a chance to express their views to the [school] board, it cannot accommodate the sort of uninhibited, unstructured speech that characterizes a public park." *Lowery*, 586 F.3d at 432. As such, school boards are permitted to set reasonable, viewpoint-neutral limits on the subject matter of and the process by which members of the public may provide comment, as well as on the time, place, and manner of said comments. Otherwise, members of the public would be free to raise idiosyncratic, personal complaints and air irrelevant grievances—thereby derailing or delaying a school board's work, frustrating the purpose of the meeting, and "deny[ing] other citizens the chance to make their voices heard." *Id.* at 433. In short, the First Amendment does not provide a right to commandeer school board meetings. *See id.*

On these basic premises, the parties agree.  The parties' disagreement and Plaintiffs' claims center on whether the First Amendment prohibits the Board and its Members from enforcing the public-interest provision, the abrogated address-disclosure requirement, and the abrogated abusive-comments restriction to ensure its meetings remain orderly and productive. Our task now does not include conclusively answering these questions.  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 884 (6th Cir. 2025).  Rather, we must evaluate the district court's "ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion."  *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (quoting *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 454 (6th Cir. 2014)).

## A.  Preliminary Injunction

"A preliminary injunction is 'an extraordinary remedy.'"  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 470–71 (6th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  It is "never awarded as of right," *A.C.L.U. Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Platt*, 769 F.3d at 453), and "[t]he party seeking a preliminary injunction bears the burden of justifying such relief[,]" *id.* (quoting *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012)).  To qualify, a plaintiff must "establish that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  When assessing an appeal of a preliminary injunction decision involving the First Amendment, we "review the District Court's legal rulings de novo (including its First Amendment conclusion), and its ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion."  *O'Toole*, 802 F.3d at 788 (quoting *Platt*, 769 F.3d at 454).  We review the district court's factual findings for clear error. *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

### 1.  Standing and a Likelihood of Success on the Merits

Standing is a jurisdictional requirement grounded in Article III of the Constitution that "'ensure[s] that federal courts do not exceed their authority' and 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *State ex rel.*

*Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To establish Article III standing, a plaintiff must demonstrate (1) an injury in fact that is (2) caused by the defendant's conduct and (3) redressable by a favorable court decision. *Susan B. Anthony List v. Driehaus¸* 573 U.S. 149, 157–58 (2014). Plaintiffs "bear[] the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the preliminary injunction stage, then, [each] plaintiff must make a 'clear showing' [through evidence] that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22); *see also Memphis A. Phillip Randolph Inst. v. Hargett*, 978 F.3d 378, 391–92 (6th Cir. 2020) (requiring court to consider the full record before it when ruling on a preliminary injunction). And because "standing is not dispensed in gross," each plaintiff "must demonstrate standing for each claim that [she] presses . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

Where, on an appeal of an order on preliminary injunction, a party's standing to bring particular claims appears dubious, our review of the propriety of the district court's order—at least with regard to those claims—may begin and end there. *See Murthy*, 603 U.S. at 56. This is because standing analysis, though not an inquiry into a claim's merits, is still "relevant to [the] likelihood of success [on the merits]" inquiry, *Arizona v. Biden*, 40 F.4th 375, 383 (6th. Cir. 2022). "This stands to reason because an 'affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that [the] plaintiff has standing.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255–56 n.4 (6th Cir. 2018) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring in part)). Thus, "[a] party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Id.* (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)). Accordingly, we must determine whether Plaintiffs have demonstrated standing to seek a preliminary injunction. *See Murthy*, 603 U.S. at 58.

Plaintiffs seek injunctive relief, so our analysis focuses on the claims challenging future enforcement of each provision. An alleged injury is constitutionally sufficient only if it is

"actual or imminent, not 'conjectural' or 'hypothetical.'" *Driehaus*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560). The Supreme Court has explained that the threat of enforcement is "sufficiently imminent" to constitute an injury-in-fact if a plaintiff alleges that she is "subject to such a threat," meaning that: (1) she intends "to engage in a course of conduct arguably affected with a constitutional interest," (2) this conduct is arguably "proscribed by a statute," and (3) that there is "a credible threat" of the statute's enforcement against the plaintiff. *Id.* at 158–59 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

Plaintiffs aver that they intend to continue speaking before the Board on topics related to its administration of Wilson County schools without tempering their strongest criticisms or disclosing their addresses. As described above, Plaintiffs retain First Amendment rights when providing public comment at a school board meeting, *see, e.g.*, *Lowery*, 586 F.3d at 432, so their intended conduct is no doubt affected with a constitutional interest. And that conduct is certainly proscribed by the address-disclosure requirement and may well be proscribed by the public-interest provision and abusive-comments restriction depending on how the two provisions are interpreted. The third requirement of a pre-enforcement injury-in-fact, that there is a credible threat of enforcement against Plaintiffs, warrants further discussion.

To demonstrate a credible threat of enforcement, a plaintiff need not expose herself to actual arrest or prosecution. *Christian Healthcare Ctrs. Inc. v. Nessel*, 117 F.4th 826, 848 (6th. Cir. 2024). A credible threat of enforcement may be established at the preliminary injunction stage through evidence of subjective chill and some combination of several factors: (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016). Each factor need not be established, nor is the list exhaustive. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021); *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (per curiam) (noting that the *McKay* factors are not "a laundry list"). The relevant question is whether "surrounding factual circumstances" plausibly suggest a credible

fear of enforcement.  *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

We begin with the public-interest provision.  The provision applies only to the third avenue through which individuals may address the Board; it is not the only—or even the first—means of providing public comment at school board meetings.  Would-be speakers may be added to the agenda under Policy 1.404's first avenue by submitting a written request to the Director of Schools' office ten working days before the scheduled meeting.  After the agenda is set, individuals may pursue the second avenue by signing up prior to the meeting to address agenda items.  Thus, the third avenue serves as a safety net to ensure that those who failed to employ the first two avenues have an opportunity to speak.  Any credible threat of enforcement of the public-interest provision arises only in this limited circumstance.

The Complaint contains a single explicit reference to the public-interest provision.  But that reference merely describes the provision as part of a larger explanation of how Policy 1.404 provides three avenues to address the Board.  Later in the Complaint, Plaintiffs allege that "[Lemons] contacted Defendant Padilla for permission to speak on a non-agenda item.  Padilla granted her request."  R. 1, Compl., PageID 12.  This allegation, however, does not assert that Padilla considered whether Lemons's remarks were "in the public interest" before permitting her to speak.  Nor does it suggest that Lemons altered her speech to secure Padilla's permission to speak at the October 2022 Board meeting.  Indeed, it does not suggest that Padilla knew the viewpoint or even the subject matter of Lemons's intended remarks.

These allegations, moreover, are not supported by record evidence.  The Plaintiffs submitted Policy 1.404 as an exhibit, but did not reference the public-interest rule in either of the declarations submitted.  And Lemons's declaration does not mention Padilla or suggest that he or any Board member scrutinized the substance of her comments pursuant to the public-interest provision before permitting Lemons to speak.  With no evidence supporting Plaintiffs' limited allegations, we turn to whether they adequately demonstrated subjective chill and surrounding factual circumstances supporting a credible threat of enforcement.

Begin with subjective chill. The record does not suggest that a single person—let alone Lemons, Dunagan-Price, or any other member of the Wilson County Chapter—has altered her speech or that her speech has been deterred based on the public-interest provision. And, although the record contains several assertions about the impact of the Board's alleged censorship, including that Lemons, Dunagan-Price, and other Wilson County Chapter members have self-censored out of apprehension that the Board might cut them off before they can provide their full remarks, that described chill is squarely attributed to the potential enforcement of the other two challenged provisions, not the public-interest provision. Plaintiffs, therefore, have not made this "first and most important" showing to establish a credible threat of enforcement. *Fischer*, 52 F.4th at 307.

The dearth of relevant evidence affects our analysis of the credible threat factors as well. The record lacks any indication that: (1) the Board has ever enforced the public-interest provision to prohibit a member of the public from providing comments at a school board meeting; (2) Plaintiffs have ever received a warning letter or were otherwise warned that their remarks to the Board had to be "in the public interest"; (3) non-Board Members or the public can initiate an enforcement action; or (4) any Board member has ever been asked to—let alone refused to—disavow enforcement of the challenged statute against any Plaintiff. Plaintiffs have not adequately demonstrated any factor delineated by our caselaw. And, although the record indicates that Lemons, Dunagan-Price, and other members of the Wilson County Chapter intend to speak at future school board meetings, it contains little evidence that any person is required or likely to do so by requesting the Chair or another Board Member to recognize her to address a non-agenda item. Policy 1.404 contains two other avenues to address the Board—by either submitting a timely written request to have remarks added to a meeting's agenda or requesting to address an agenda item. Because neither avenue is affected by the public-interest provision, we can only speculate on the likelihood that a single member of the Wilson County Chapter might be subject to the provision. And, even then, the record contains no suggestion that the provision might be enforced. Thus, the "surrounding factual circumstances" do not suggest a credible threat of enforcement. *Universal Life Church Monastery Storehouse*, 35 F.4th at 1034.

Plaintiffs ground their standing argument in the Supreme Court's caselaw involving challenges to municipal permitting regimes. Oral Arg Tr. at 44, 46 (citing *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992)). In *Forsyth County*, before hosting a rally, the plaintiffs had to go through the county's permitting regime and pay a fee, 505 U.S. at 126, which they alleged was set arbitrarily, *id.* at 130. Because the plaintiffs had planned a rally, the court held they were subject to that regime and had standing to challenge it. *Id.* at 125. Analogizing to *Forsyth County*, Plaintiffs argue that because they are planning to speak to the Board, they are subject to the allegedly arbitrary public-interest provision and have suffered injury.

But *Forsyth County* does not help Plaintiffs here because they have not asserted that their speech will be subject to the public-interest provision. Plaintiffs enjoy multiple avenues to speak at Board meetings, and only one avenue involves the public-interest provision. Plaintiffs have neither alleged nor adduced facts indicating that they have used or intend to use that avenue. Moreover, they have neither alleged nor adduced facts indicating that, if they were to use that avenue, the Board would try to enforce the public-interest provision. So, *Forsyth County* does not rescue Plaintiffs' challenge to the public-interest provision.

Without demonstrating a credible threat of enforcement of the public-interest provision, Plaintiffs have not made a clear showing that they are likely to establish an Article III pre-enforcement injury. *See Murthy*, 603 U.S. at 58 (quoting *Winter* 555 U.S. at 22). And, by failing to adequately demonstrate standing, Plaintiffs necessarily cannot establish a likelihood of success on the merits of their prospective claims challenging the public-interest provision—a requirement for preliminary injunctive relief. *Biden*, 40 F.4th at 387.

Plaintiffs' challenges to the address-disclosure requirement and the abusive-comments restriction are more particularly pleaded and established in the record. Plaintiffs explicitly averred that both rules have deterred Lemons, Dunagan-Price, and other Wilson County Chapter members from sharing their complete and honest opinions with the Board out of confusion over the rules' scope, out of fear of reprisal by members of the public who might disagree, or out of concern that the Board will publicly cut them off. These assertions of subjective chill are accompanied by additional evidence that our precedent has held suggests a credible threat of

enforcement. For one, the record establishes that the Board enforced the address-disclosure requirement against Lemons on October 3, 2022, indicating Defendants' history of enforcing the rule against a plaintiff. The record also demonstrates that at the beginning of each public comment period the Chair reads from a script containing both rules and asks each speaker if he or she would like the script to be read again before addressing the Board. This script constitutes a warning to each would-be speaker that the Board is prepared to enforce the stated rules if they are violated. Taken together, this evidence suggests the credible threat of enforcement that is required to demonstrate an Article III injury.

Plaintiffs have offered evidence clearly showing a likely causal connection between their prospective injury and the two rules and also that enjoining the rules is substantially likely to remedy that injury. We conclude that Plaintiffs have sufficiently established standing to preliminarily enjoin the address-disclosure requirement and the abusive-comments restriction.

Thus, we affirm the district's court denial of Plaintiffs' motion to preliminarily enjoin the public-interest provision and proceed to the merits of their motion to preliminarily enjoin the other two rules.[1]

### 2. The Merits of Plaintiffs' Motion

Preliminary injunctions in constitutional cases often turn on the likelihood of success on the merits of the plaintiffs' claims. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). But this general rule does not do away with the "indispensable" prerequisite of showing a likelihood of immediate and irreparable harm. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Of course, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A plaintiff, however, must also show that the alleged harm is "likely, not remediable at final judgment, and immediate." *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023). "[E]ven the strongest

---

[1]Our standing inquiry here is limited to Plaintiffs' standing to seek a preliminary injunction. As did the district court in *Murthy* after the Supreme Court's remand, the district court here should evaluate its continuing jurisdiction over Plaintiffs' suspect claims. *See generally Missouri v. Biden*, No. 3:22-CV-01213, 2024 WL 5316601, at *1 (W.D. La. Nov. 8, 2024) (order).

showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *Sumner Cnty. Schs.*, 942 F.3d at 326–27 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). After all, "[i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* at 327.

To make the requisite showings, Plaintiffs submitted declarations from Lemons and Dunagan-Price. Plaintiffs also filed a copy of Policy 1.404 and the related Policy 1.400, and videos of eleven Board meetings that either Lemons or Dunagan-Price attended or watched remotely in 2022. In their declarations, Lemons and Dunagan-Price reaffirmed the allegations contained in the Complaint, asserted that the Board's Chair rarely enforced the address-disclosure rule in the meetings they attended in 2022, and averred that they and other Wilson County Chapter members remain fearful of addressing the Board based on the two rules.

In response, Defendants offered evidence demonstrating that the Board had amended the script that the Chair reads at meetings to remove any reference to either the address-disclosure requirement or the abusive-comments restriction. And, prior to the district court issuing its ruling, Defendants filed supplemental briefing, which included evidence of a revised Policy 1.404 that no longer contained the address-disclosure requirement, along with agendas of the Board meeting where the changes were officially adopted. Plaintiffs conceded that the Chair's script and Policy 1.404 had been amended to remove the challenged rules but argued that the changes did not moot the case.

As the district court observed, Defendants had removed all references to both rules from all Board policies and materials, and Plaintiffs offered no evidence that Defendants would enforce either abrogated rule while the case continued. Based on this record, the court concluded that Plaintiffs had failed to prove a likelihood of imminent and irreparable harm. The court then addressed Plaintiffs' mootness argument, explaining that the Defendants' voluntary cessation of the two rules could affect its analysis on whether to grant preliminary injunctive relief without necessarily mooting Plaintiffs' claims. On these grounds alone, the court denied Plaintiffs' request to enjoin either rule.

On appeal, Plaintiffs first argue that the Board's voluntary cessation of the two rules was insufficient to moot the request for a preliminary injunction. But the district court did not consider, let alone conclude, that Plaintiffs' challenges to the address-disclosure requirement and abusive-comments restriction were moot. It explicitly disclaimed that approach. Rather, the court asked whether Defendants' actions voluntarily abrogating the two rules meant that there was no longer a need to grant immediate relief as opposed to granting relief at the end of the lawsuit. A court is "well within its province" to deny a preliminary injunction "based solely on the lack of an irreparable injury." *Sumner Cnty. Schs.*, 942 F.3d at 327 (citation omitted).

Next, Plaintiffs contend that the likelihood of success on the merits of their challenges should dictate the outcome of their preliminary injunction motion without regard to the likelihood of imminent and irreparable harm. Of course, the loss of First Amendment freedoms constitutes irreparable harm. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod*, 427 U.S. at 373). Even so, if a litigant seeking a preliminary injunction cannot show that the injury is likely, then she has not demonstrated a likelihood of irreparable harm. *Winter*, 555 U.S. at 20. She has only shown speculative or potential harm. And a "possibility" of harm does not entitle Plaintiffs to a preliminary injunction. *Id.* at 22. Indeed, it is well-established that even if Plaintiffs present a winning case on the merits, they must show that, absent the court's intervention, the challenged provisions are likely to be applied to them while the case proceeds. *See, e.g.*, *Sumner Cnty. Schs.*, 942 F.3d at 327–28. This is an "indispensable" prerequisite to any preliminary injunction. *Id.* at 327.

It is also unlikely the Board will reinstate the rules. For one, the Board rescinded the rules over two years ago and has not reinstated them since. For another, the Board's attorney at oral argument committed that Board will not reinstitute the challenged rules during the pendency of the litigation. Such a representation binds the Board. *See Borror Prop. Mgmt., LLC v. Oro Karric N., LLC*, 979 F.3d 491, 495 (6th Cir. 2020) ("Once litigation commences, a party is typically bound by its action," including "an argument to the court by its counsel."); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962). Thus, between the Board's removal of the rules, the fact they have not been reinstated in over two years, and the commitments by Defendants' counsel that his client will not reinstate them, Plaintiffs cannot show a "likely"

threat of irreparable harm before a final decision on the merits. That ends their quest for a preliminary injunction. After all, the purpose of a preliminary injunction is "simply to preserve the status quo" during the litigation process. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004).

In response, Plaintiffs point to *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020) (per curiam), and *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019). In *Roman Catholic Diocese of Brooklyn*, the Supreme Court considered the Governor of New York's restrictions on attendance at religious services in areas classified as "red" or "orange" zones during the Covid-19 pandemic. 592 U.S. at 15–16. It determined that the Governor's reclassification by executive order of areas where the plaintiffs worshipped after the emergency appeal reached the Supreme Court did not undercut the plaintiffs' ability to demonstrate irreparable harm. *Id.* at 20. As the Court explained, a preliminary injunction was "still called for" because the plaintiffs "remain[ed] under a constant threat that the area in question w[ould] be reclassified as red or orange." *Id.* Crucially, Governor Cuomo had not dismantled his classification system, had not lessened the restrictions on red or orange zones, and had "regularly change[d] the classification of particular areas without prior notice." *Id.*; *see also id.* at 20 n.3 (noting eight times the Governor reclassified areas without prior notice between October 21, 2020, and November 23, 2020). These findings formed the basis of the Court's determination that the plaintiffs demonstrated a likelihood of imminent and irreparable harm. *See id.*

The threat of irreparable harm was far greater in *Roman Catholic Diocese* than here. While Governor Cuomo had changed the classification of particular areas eight times in little over a month, the Board changed the challenged policies one time before removing them entirely over two years ago. And the Board has represented to this court that it will not reinstate them during the litigation. Plaintiffs argue that the Board still can—and does—readily change its policies. But the fact that the Board can change its other policies does not take this case into the ambit of *Roman Catholic Diocese*. Here, the challenged policies have laid dormant for over two years, and the Board is bound by its counsel's representations.

*Speech First* addressed a situation in which the district court had based its denial of a preliminary injunction on the plaintiff's likelihood of success on the merits prong of the preliminary injunction analysis. 939 F.3d at 763, 767. There, we considered whether the district court properly concluded that there was no likelihood of success based on mootness after the defendant voluntarily removed the challenged definitions for "bullying" and "harassing" from its code of conduct. *Id.* at 761–62. We concluded that the case was not moot and, therefore, vacated the decision and remanded the case for the district court "to consider in the first instance Speech First's likelihood of success." *Id.* at 765, 767, 770.

But *Speech First* did not resolve whether or to what extent the defendant's voluntary cessation affected the district court's analysis of the likelihood of imminent and irreparable harm. *Id.* To be sure, the court did suggest that "[e]ven if the other three [preliminary injunction] factors weigh against a preliminary injunction, the district court may still grant one if it determines that . . . Speech First does have a strong likelihood of success." *Id.* at 770. But this line was not part of the court's holding: The *Speech First* court did not "consider[] the issue and consciously reach[] a conclusion" about whether the defendants' voluntary cessation affected the irreparable-harm requirement. *Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019). All the court decided was that the case was not moot and the plaintiffs had standing and, therefore, remanded the case so the district court could reconsider the preliminary injunction factors. *Speech First*, 939 F.3d at 770. The court's single line about the district court's possible calculus on remand did "*nothing* to determine the outcome" of the case at issue—in other words, it was "dictum" with "no binding force." *Wright*, 939 F.3d at 701. What's more, this court fully considered the irreparable-harm requirement in *Sumner County Schools*, finding it "indispensable." 942 F.3d at 327. So, *Speech First* does not alter our analysis.

Plaintiffs' only remaining argument suggests that there is an "ongoing threat" of irreparable harm because "[t]he Board's historical practice of threatening to enforce non-existent rules and discriminatorily enforcing the rules that actually exist chills Plaintiffs' protected speech." Presumably, by "non-existent rules," Plaintiffs refer to the abusive-comments restriction, which was omitted from Policy 1.404 but had been included in prior iterations of the Chair's script. But, again, because two years have passed, the Board has not reinstated either

requirement, and the Board has told us they will keep it that way during the litigation, Plaintiffs have not shown that irreparable harm is likely.

The address-disclosure requirement and abusive-comments restriction are no longer operative, and Plaintiffs offer no evidence indicating that either might be reinstituted and applied in the future. At bottom, Plaintiffs fail to establish a likelihood of imminent and irreparable harm from either challenged rule for which they have standing and, therefore, have failed to carry "the burden of justifying [preliminary injunctive] relief." *A.C.L.U. Fund of Mich.*, 796 F.3d at 642 (quoting *McNeilly*, 684 F.3d at 615).

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Plaintiffs' motion for a preliminary injunction and **REMAND** for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

THAPAR, Circuit Judge, concurring.   For parents, few things matter more than their children's education.   But when a group of moms began voicing concerns to their local Tennessee school board, they discovered that their input wasn't welcome.   They now challenge the set of policies that restricted the tone, content, and format of their remarks.   While I agree with the majority that the moms are not entitled to a preliminary injunction, I write separately to emphasize the troubling nature of the Board's rules.

Start with the Board's policy of cutting off "abusive" comments.   The Board offers no guidance to distinguish "abusive" comments from critical or insulting ones.   *See* Compl. at 7, R. 1, Pg. ID 7.   That distinction matters because the First Amendment prevents the government from discriminating against a speaker based on her viewpoint—regardless of whether that view is offensive or polite.   *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion); *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019). When the Board bars offensive remarks but not flattering ones, it necessarily picks and chooses between opposing perspectives.   This act of selection arguably makes the abusive-speech restriction an "egregious form of content discrimination" that is "presumed to be unconstitutional."   *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995).   Put another way, the Board can't implement the equivalent of a "happy-talk" requirement that forces speakers to make their remarks "grammatically palatable to the most squeamish among us."   *Matal*, 582 U.S. at 246; *Cohen v. California*, 403 U.S. 15, 25 (1971).   In a free society, after all, the listener—not the government—decides whether remarks are worthwhile.   And the price of that freedom is often unkind, offensive, or insulting speech.

Restrictions on this freedom aren't just unwise—they're usually unconstitutional.   Our court has repeatedly held that "happy-talk" requirements like the Board's abusive-speech restriction cross the constitutional line.   For instance, we have found a city council's policy barring "attacks on people or institutions . . . could be construed as viewpoint discrimination."   *Youkhanna v. City of Sterling Heights*, 934 F.3d 508, 520 (6th Cir. 2019).   Elsewhere, we

invalidated a prohibition on advertisements likely to invite "scorn or ridicule," reasoning that the restriction necessarily discriminated "between two opposed sets of ideas." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 500 (6th Cir. 2020) (citation omitted). And most recently, we struck down a school board's policy barring "antagonistic," "abusive," and "personally directed" comments because it discriminated against speech that "opposes, or offends, the Board or members of the public." *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021). Our rule is simple: "the government may not censor speech merely because it is 'offensive to some.'" *Id.* at 894 (citation omitted). But the Board's abusive-speech restriction appears to do just that.

The Board's requirement that speakers announce their home addresses at the beginning of their remarks is little better. Policies that fall short of a direct prohibition on First Amendment expression may nevertheless amount to a constitutional violation when they "deter[]" or "chill[]" speech. *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of this statute is, in large measure, one of self-censorship."). Forcing commenters to disclose their home addresses before speaking on controversial or hot-button issues seems particularly likely to silence a would-be speaker. *See Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021). And the Board seemed aware of this chilling effect: After permitting some commenters to proceed without disclosing their addresses, it appears to have enforced the requirement midway through a controversial comment, precisely because it was likely to deter the speaker.

The Board's policy that unplanned speeches must be "in the public interest" presents additional constitutional infirmities. In a limited public forum, the government "must be able to articulate some sensible basis for distinguishing what [speech] may come in from what must stay out." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). But the Board's requirement that speech be "in the public interest" doesn't meet this standard. Who, after all, is the relevant "public," and what's in their "interest?" Without answers to these basic questions, the policy invites "a virtually open-ended interpretation" and lacks "objective, workable standards" to guide its application. *Id.* at 21. While the Board could certainly limit speech to school-related matters,

the public-interest rule seems like a textbook "opportunity for abuse." *Id.* (quoting *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)).

If Plaintiffs can establish standing to challenge the public-interest provision, their arguments may carry weight. In similar cases, our sister circuits have struck down rules barring speech that is "off-topic," concerns "public issues," or implicates "matters of public debate." *PETA v. Tabak*, 109 F.4th 627, 630 (D.C. Cir. 2024); *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 188 (4th Cir. 2022); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 309 (3d Cir. 2020). These courts uniformly found the standards at issue "not . . . capable of reasoned application" because their interpretation and application depended on the government's say-so. *Mansky*, 585 U.S. at 23. Indeed, Moms for Liberty has elsewhere prevailed on a challenge to a school board's policies barring comments that were "personally directed" on this exact theory. *Moms for Liberty - Brevard Cnty. v. Brevard Pub. Sch.*, 118 F.4th 1324, 1328 (11th Cir. 2024). It is difficult to see daylight between those unconstitutional policies and the Board's.

At bottom, there's a difference between a limited public forum and an unduly restrictive one. At a time when many parents are disengaging from public education, those parents who put in the effort to advocate for the wellbeing of their children—and their neighbors' children— should be celebrated, not silenced. The Board should have sought out the exact kind of content it censored: critical comments that flag problems and suggest improvements. It was never required to force commenters to announce their home addresses, restrict the tenor or topic of their remarks, or curtail impromptu speeches on any subject. These efforts to limit parents' input into their children's education reflect the Board's judgment about the type of feedback that it values. And that choice speaks volumes. After all, what's the point of the meeting if only positive comments are welcome? The First Amendment protects the critic and the champion equally for a reason.

Plaintiffs fall short of the demanding standard for interim relief because the Board has not applied its suspect rules in over two years and has promised to keep it that way during litigation. But if the Board reinstated its policies or indicated that it would, Plaintiffs would be well-

positioned to seek a temporary restraining order for prompt relief. And if Plaintiffs can establish standing, their allegations that the Board's remaining policies impermissibly chill protected speech deserve close consideration.